```
          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
```

| | | |
|---|---|---|
| DAPHNE R. CHANDLER | : | CIVIL ACTION |
| v. | : | |
| UNIVERSITY OF PENNSYLVANIA | : | NO. 12-5127 |

MEMORANDUM

McLaughlin, J.                                    February 28, 2013

      This employment discrimination suit arises from the University of Pennsylvania's decision not to hire the plaintiff, who is African American, for a position in its Positive Psychology Center. The plaintiff, Dr. Daphne Chandler, argues that the University of Pennsylvania ("Penn") refused to hire her on account of her race in violation of 42 U.S.C. § 1981. Penn has moved to dismiss Chandler's complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

      The Court will grant Penn's motion and dismiss Chandler's § 1981 claim without prejudice.

I.   Factual Background

      The facts are drawn from the complaint, accompanying exhibits submitted by the plaintiff, and materials incorporated in the complaint by reference, all of which the Court may consider in deciding a motion to dismiss. Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006). The Court accepts

as true all well-pleaded facts in the complaint and draws all reasonable inferences in favor of the non-moving party, while disregarding any legal conclusions.  See Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).

   A.   The Parties

Dr. Daphne Chandler holds a Ph.D in educational psychology from the University of Wisconsin and has worked as a school psychologist and clinical evaluator.  In addition, Chandler has conducted scholarly research in the field of positive psychology.  Chandler's research is primarily devoted to psychological constructs, such as hope, resilience, and forgiveness, in African American communities, particularly among African American youth.  Chandler describes her research as "insert[ing] an orientation toward social justice" into the field of positive psychology, focusing on, among other things, issues of multiculturalism to better understand and identify the psychological needs of all communities.  Compl. at 2, 7-9; PX B (3/23/12 Cover Letter & Daphne R. Chandler Curriculum Vitae ("CV")).[1]

The defendant, Penn, is a private university located in Philadelphia, Pennsylvania.  During the fall of 2011, 2.8% of Penn's faculty was African American or black, while white

---

[1] "PX" refers to the exhibits submitted along with Chandler's complaint.

individuals made up 79.2% of that body.  For that same period, 5.1% of the graduate student population at Penn was African American or black.  Compl. at 2, 5 (citing <u>Diversity at Penn: Facts and Figures</u>, http://diversity. upenn.edu/diversity_at_penn/ facts_figures/ (last visited Feb. 21, 2013)).  These figures are low, relative to the percentage of the overall U.S. population that identifies as black.  According to the U.S. Census Bureau, approximately 13.1% of people living in the United States are black.[2]  U.S. Census Bureau, <u>State & County QuickFacts: USA</u>, http://quickfacts.census.gov/qfd/states/00000.html (last visited Feb. 21, 2013).

Penn operates the Positive Psychology Center ("Center"), which was established in 2003 by Dr. Martin E.P. Seligman, a psychologist at the university.  The Center aims to "promote research, training, education, and the dissemination of Positive Psychology," a subfield of psychology dedicated to "the scientific study of the strengths and virtues that enable individuals and communities to thrive."  Compl. at 5 (quotation marks and alteration omitted).

---

[2] That figure is based on demographic data from 2011 and includes persons reporting only one race.  The Court takes judicial notice of the U.S. Census Bureau's finding.

B.  <u>Chandler's Application to the Center</u>

On March 23, 2012, Chandler applied for a post-doctoral fellow position at the Center. <u>Id.</u> at 2. According to Penn's advertisement listing the open position, the fellow would be hired to "analyze data and prepare publications for a large research grant on Positive Health among Army Soldiers." The fellow would also work with Dr. Seligman and other senior psychologists at the Center. Penn listed as a requirement for the position "[e]xperience with large-scale data sets using advanced statistics, as well as an understanding of the interface between mental and physical health." Individuals with a Ph.D in psychology, health and human development, social epidemiology, or a related field were invited to apply. PX A (Position Description).

As part of her application, Chandler submitted a cover letter, a CV containing a picture of herself, and two articles that she had authored. Compl. at 2-3, 8, 12; PX B. The CV Chandler submitted was eight pages long. It listed her current positions as a quality assurance supervisor and clinical evaluator at Germantown Psychological Associates and as an educational psychology consultant. The CV also detailed, among other things, Chandler's educational background, licenses and certifications, publications, research projects, workshops and presentations, and prior professional experience. PX B.

Chandler states that "her experience with 'large-scale data using advanced statistics' is not readily apparent from [that] CV." Compl. at 9.

In her cover letter to the Center, Chandler discussed her qualifications for the fellow position and attempted to highlight her experience with quantitative research.  Chandler noted that her research "has included quantitative methods, especially multiple regression analyses, factor analyses, and ANCOVAS [(analyses of covariance)], as well as qualitative methods, using the constant comparative approach with grounded theory for typically small sample sizes and large-scale samples." She did not list in her cover letter or CV specific examples of her research involving or experiences with quantitative methods. In addition, Chandler stated in her cover letter that she had served in the U.S. Army Reserves for six years.  PX B

The two sample articles that Chandler submitted describe studies where she employed qualitative methods to analyze data gleaned from sets of participants.  In both studies, Chandler utilized the constant comparative approach for grounded theory research, which she describes in her cover letter as a qualitative mode of analysis.  In one study, Chandler reviewed questionnaires answered by forty-seven black students and faculty members to develop better recruitment and retention strategies for black students and professors in the field of psychology.

PX C (Daphne R. Chandler, <u>Proactively Addressing the Shortage of Blacks in Psychology: Highlighting the School Psychology Subfield</u>, 37 J. Black Psychol. 99 (2011)).  In the second, Chandler surveyed narratives of six high-achieving black junior high school students to identify and test an "African hope theory."  PX D (Daphne R. Chander, In Spite of Racism, Inequality, and School Failure: Defining Hope with Achieving Black Children Abstract 8, 11, 18 (unpublished manuscript)).

In addition to submitting her application through formal channels, Chandler personally e-mailed Dr. Seligman on March 26, 2012 to inform him that she had applied for the fellow position and to tout her qualifications, stating that it "[s]eems like I'm your girl."  Chandler also informed Seligman that she intended to visit the Center and that she was interested in meeting with him in person.  Seligman responded to Chandler by e-mail and told her that the Center only meets with applicants upon invitation.  Chandler sent an e-mail reply to Seligman, stating that she thought that would be the Center's position and expressing her belief that their "paths [were] sure to cross again and hopefully in a good way."  Chandler and Seligman did not have any further correspondence.  Compl. at 20.

On April 25, Chandler called the Center to inquire about the opportunity to interview for the fellow position.  The faculty assistant with whom Chandler spoke informed her that the

Center would not be able to offer her the job, "despite [her] strong qualifications." The faculty assistant further stated that the application process was "competitive" and that the Center had received applications from "numerous strong candidates." Id. at 4 (quotation marks omitted).

That day, Chandler also spoke over the telephone with the executive director of Penn's Office of Affirmative Action and Equal Opportunity Programs, Samuel Starks. Starks requested information from Chandler and agreed to meet with her in person at his office the next day, April 26. When Chandler arrived for her meeting, Starks' assistant informed Chandler that she would not be able to speak with Starks, as he had to leave the office unexpectedly. Instead, Chandler met with Associate Director Patrice Miller. Chandler filed a complaint against the Center that same day, alleging a claim of racial discrimination in hiring. Id. at 4, 21.

After conducting an investigation into Chandler's complaint, the Office of Affirmative Action and Equal Opportunity Programs found no evidence of racial discrimination in the Center's decision not to hire Chandler. On June 20, 2012, Miller again spoke to Chandler and explained why she had not been given an interview for the fellow position. Miller informed Chandler that the search committee had determined, based on a review of candidate cover letters and resumes, that Chandler lacked skills

and experience relating to advanced statistical analysis and an understanding of the interface between mental and physical health.  Miller also informed Chandler that she had been the only black applicant for the fellow position.  Miller stated that "candidate selections were made without regard to race or ethnicity" and that no organizational strategy had been implemented to support Penn's affirmative action or equal opportunity goals in the Center's consideration of candidates.  Miller also told Chandler that two finalists for the position had been selected, but that she could not recall the race of either finalist.  She believed that one finalist was a white male and that the other may or may not have been a female who may or may not have been white.  Id. at 21-22 (quotation marks omitted).

II.  Analysis

To state a claim under § 1981, a plaintiff must show (1) that she is a member of a racial minority; (2) an intent, on the part of the defendant, to discriminate on the basis of race; and (3) discrimination concerning one or more of the activities listed in the statute, which include the right to make and enforce contracts.  Brown v. Philip Morris Inc., 250 F.3d 789, 797 (3d Cir. 2001).  In employment discrimination cases, the legal standard applicable to § 1981 claims and claims brought under Title VII of the Civil Rights Act of 1964 are equivalent.

Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 499 (3d Cir. 1999); Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998). Ultimately, Chandler must prove that Penn decided not to hire her because of her race. Desert Palace, Inc. v. Costa, 539 U.S. 90, 92-93 (2003); Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977). To survive a motion to dismiss, however, Chandler is only required to put forth allegations that state a plausible claim of discriminatory treatment. Fowler, 578 F.3d at 211 (citing Wilkerson v. New Media Tech. Charter Sch., Inc., 522 F.3d 315, 322 (3d Cir. 2008)).

Chandler makes several allegations that, she argues, adequately make out a claim of racial discrimination. First, Chandler claims that she was eminently qualified for the fellow position and notes that she was the only black applicant; however, she was not chosen as a finalist or ultimately selected for the job. Second, Chandler points to longstanding or structural issues that allegedly establish institutional racial discrimination at the Center and Penn. According to other psychologists in academia, the field of positive psychology, in general, and Dr. Seligman and the Center, in particular, are racially and culturally biased, largely ignoring individuals of color in their research. Additionally, the percentages of African Americans on Penn's faculty and in its graduate student

-9-

body do not correspond to the percentage of African Americans in the U.S. population as a whole.[3]  None of these allegations, either separately or in combination, is sufficient to establish a plausible claim that Chandler was not hired because of her race.

Chandler asserts, several times in the complaint, that Penn's decision not to hire her, in spite of her evident credentials and coupled with the fact that she is black, is demonstrative of race-based discrimination.  For example, Chandler's complaint states that "[t]he only reasonable conclusion after reviewing her experience and communication with the Center is that Dr. Seligman and his colleagues do not have any sincere interest in hiring Black faculty or spreading positive mental health to Blacks or any other non-White group." Compl. at 20-21.  The complaint similarly asserts that, "[t]o suggest, whether on academic merits or other professional and life experience that Dr. Chandler was not worthy of consideration for the Center's Post-Doctoral Fellow position . . . is an insult not only to her as an intellectual, but also to the U.S. Army and all advocates for equality and civil rights in America and the world." Id. at 19.  These assertions are too conclusory to substantiate a claim of discrimination, and the Court is not

---

[3] Chandler asserts that post-doctoral fellows are best considered as members of Penn's faculty.  Compl. ¶ 16.  Because Chandler's complaint includes figures relating to the composition of both the faculty and the graduate student body at Penn, the Court discusses both.  The Court's decision does not depend on which of those two constituencies includes the Center's post-doctoral fellows.

required to accept them.  See Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011); see also Waiters v. Aviles, 418 F. App'x 68, 71 (3d Cir. 2011) (per curiam).

Moving to the well-pleaded allegations in Chandler's complaint, her claim runs into a threshold problem.  Upon review of the complaint and accompanying materials, it seems that Chandler did not possess a requisite qualification for the position to which she applied, fatally undermining her claim that Penn's decision not to hire her was racially motivated.

Penn argues that Chandler's complaint demonstrates her lack of "[e]xperience with large-scale data sets using advanced statistics," a requirement for the fellow position.  See PX A.  Significantly, Chandler admits that any experience she has engaging with "'large-scale data using advanced statistics' is not readily apparent from the CV" she submitted to the Center.  Compl. at 9.  The Court has not gleaned anything from Chandler's resume that would undercut her assessment.  The titles of the authored publications and the descriptions of research projects, workshops, and presentations listed on Chandler's CV do not demonstrate that her scholarship has focused on or utilized "large-scale data sets" or "advanced statistics."  The professional practice section of Chandler's CV also reflects her work as a clinician and one-on-one diagnostician, not any background in advanced statistical work.

Contrary to Chandler's assertions, the other materials that she submitted as part of her application also do not appear to demonstrate her familiarity with large-scale statistical methods. Chandler stated in her cover letter to the Center that "[her] research has included quantitative methods, especially multiple regression analyses, factor analyses, and ANCOVAS." PX B. She did not, however, include any examples of her work with these statistical methods, either in the body of the cover letter or by reference to specific research projects described in her resume. Even assuming that Chandler's cover letter conveys a background in advanced statistics, the letter says nothing about her use of such methods in the analysis of "large-scale data sets." The articles that Chandler provided the Center similarly fail to show her experience in this area. Those articles detail Chandler's qualitative analyses of small-scale studies involving six and forty-seven participants, respectively. Chandler's complaint does not otherwise outline how she possesses this requisite qualification.

Chandler contends that, if her qualifications for the fellow position were not clear from her application materials, "it was the responsibility of the Center to ask her for clarification or to submit further information." Pl.'s Opp. at 4. Chandler offers no support for this proposition. Indeed, it misperceives the application and interview process, which

often involves screening applicants with uncertain credentials and considering with greater care only some of the many candidates for any particular position. See Waris v. Heartland Home Healthcare Servs., Inc., 365 F. App'x 402, 405 (3d Cir. 2010) (per curiam) (noting that a plaintiff in a Title VII failure-to-hire case had no "entitle[ment] to an interview").

As a final argument regarding her qualification, Chandler maintains that, in any event, her complaint adequately alleges that Penn "admitted that she was qualified for the position." Pl.'s Opp. at 3 (citing Compl. at 4). Yet, the complaint does not contain any such allegation. Rather, the complaint asserts that, when Chandler contacted the Center to inquire about her application status, a faculty assistant informed her that the Center would not be able to hire her, "despite [her] strong qualifications." Compl. at 4 (quotation marks omitted). There is nothing in the complaint to suggest that the faculty assistant was involved in the hiring process or could speak to the decisionmakers' evaluation of Chandler's application. And, as already discussed, a review of Chandler's application would not have shown that she was qualified in all respects for the position to which she applied.[4]

---

[4] Notably, Chandler does not contend that any lack of qualification should be ignored because the individuals considered or hired at a later stage of the application process were similarly unqualified, an allegation that would tend to support a claim of racial discrimination. See Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 540-42 (3d Cir. 2006).

Crediting the faculty assistant as someone with knowledge of the applicants' relative strength, and even considering the assistant's statement about Chandler's qualifications as an admission of her fitness for the felllow position, Chandler's complaint still fails to set out a violation of § 1981. After noting that Chandler's qualifications were "strong," the faculty assistant added that the selection process had been "competitive" and that there had been "numerous strong candidates." Id. (quotation marks omitted). Evidently, Chandler would have been one of many "strong" applicants that the Center declined to hire. This does not lead to the conclusion that race was a factor in her rejection.

Nor do the other allegations in the complaint plausibly demonstrate racial motivation in Penn's hiring decision. Chandler points out that Penn winnowed the candidate field to two finalists for the fellow position and that she was not one of them. Given Chandler's allegation that she was the only black applicant, the two finalists appear to have been of a different race or races. A civil rights plaintiff may demonstrate discriminatory treatment by pointing to individuals who are similarly situated in all pertinent regards, save the protected classification at issue, and who were treated more favorably than the plaintiff. See, e.g., Sarullo v. U.S. Postal Serv., 352 F.3d 789, 798 (3d Cir. 2003) (per curiam); Simpson v. Kay Jewelers,

142 F.3d 639, 645-47 (3d Cir. 1998).

The problem for Chandler is that she has not offered any allegations regarding the qualifications of the two finalists. The complaint does not allege that they, or any other interviewed candidates, if indeed there were any, had "qualifications similar to the plaintiff's." Sarullo, 352 F.3d at 797. Chandler seems to assume that the two finalists could not be more qualified than she, but offers no substantiating allegations on this point. In effect, she has not asserted that the two post-doctoral fellow finalists are similarly situated, which she must do to premise even an inference of discrimination on their continued candidacy and her rejection. See Jewett v. Int'l Tel. & Tel. Corp., 653 F.2d 89, 91 (3d Cir. 1981) (finding that a failure-to-hire claim is not made out where a hiree has qualifications superior to the plaintiff applicant); Pinckney v. Cnty. of Northampton, 512 F. Supp. 989, 998 (E.D. Pa. 1981), aff'd, 681 F.2d 808 (3d Cir. 1982), cited in Scheidemantle, 470 F.3d at 540-41 (same). Without having any basis for comparing the relative skills and experiences of Chandler and the two finalists, it is not plausible to impute racial discrimination solely from the fact that Chandler, the sole black candidate, was not hired.

Putting aside comparator information, Chandler argues that racial discrimination may be inferred from the fact that Dr.

-15-

Seligman and the Center take a "monocultural[]" approach to positive psychology and have historically focused on the psychological stress and happiness of "Euro-American" individuals to the exclusion of racial minorities. Compl. at 5-6. Chandler cites several scholarly works that she suggests critique the work of the Center and its founding psychologist, Dr. Seligman, on these grounds, including articles by Drs. Richard Lazarus and Carol Ryff. Id. at 5-8, 13.

Chandler's reliance on the work of these two authors is misplaced.[5] Neither cited article suggests that Dr. Seligman or the Center has a racially myopic approach to positive psychology. Dr. Lazarus' article, although critical of Dr. Seligman, focuses on unrelated flaws in the methodology utilized by Seligman and other positive psychologists. Namely, Lazarus faults the false dichotomy between the concepts of positivity and negativity posited by many in the subfield, the movement's failure to ground in substantive terms how positivity is defined, and the "scarcity of longitudinal or intraindividual perspectives" and inattention to individual differences in much of the research. Richard S. Lazarus, Author's Response, The Lazarus Manifesto for Positive Psychology and Psychology in General, 14 Psychol. Inquiry 173-74 (2003). Dr. Ryff's article is a focused criticism of the one by

---

[5] The Court is not obliged to accept the characterization of the articles by Lazarus and Ryff offered in the complaint. Because the complaint provides direct citations to the articles, the Court may itself assess the substance of the articles. Buck, 452 F.3d at 260.

Dr. Lazarus, and does not engage with issues of multiculturalism and racial plurality in the positive psychology subfield. See Carol D. Ryff, Commentary, Corners of Myopia in the Positive Psychology Parade, 14 Psychol. Inquiry 153-58 (2003).

Assuming, for the sake of argument, that these and other psychologists referenced in the complaint have in fact criticized the Center's research as racially discriminatory or insensitive, as Chandler purports, that still would not sufficiently demonstrate that the Center engages in racial discrimination with respect to the individuals it hires to carry out that research. Scholarly allegations of bias in the Center's research do not present a claim of bias in the Center's employment decisions, as a general matter, or in its decision not to hire Chandler, specifically.

For much the same reason, Chandler cannot maintain a claim of employment discrimination based on the allegation that the Center's senior psychologists took issue with her work and research, which focus on black communities and fill multicultural voids in positive psychology theory, and refused to hire her on that basis. See Compl. at 8. Denying Chandler a position at the Center based on the subject matter of her research or the methodology she employs does not constitute discrimination on the basis of her race.

Finally, Chandler cites the under-representation of

African Americans in Penn's graduate student body and faculty as evidence of racial discrimination in her particular case. Statistical evidence in a single-plaintiff disparate treatment case, which turns on whether that individual was subjected to intentional employment discrimination, is uncommon, though not impermissible.[6]  See Abrams, 50 F.3d at 1217; Bruno v. W.B. Saunders Co., 882 F.2d 760, 766-67 (3d Cir. 1989).  Even so, courts have noted that such evidence has "relative unimportance . . . in an individual treatment case." Abrams, 50 F.3d at 1217; see also Plair v. E.J. Brach & Sons, Inc., 105 F.3d 343, 347 (7th Cir. 1997).  At best, general employment trends or patterns "'can only be collateral to evidence of specific discrimination against the actual plaintiff.'"  Gilty v. Vill. of Oak Park, 919 F.2d 1247, 1252 (7th Cir. 1990) (quoting Williams v. Boorstin, 663 F.2d 109, 115 n.38 (D.C. Cir. 1980)).  In Gilty, for instance, the Court of Appeals for the Seventh Circuit determined that, on a motion for summary judgment, generalized "pattern and practice" evidence of racial discrimination could not sustain a plaintiff's prima facie disparate treatment claim.  Id. at 1252-53.

Here, Chandler's statistics-based allegations do not aid in raising her failure-to-hire claim above the level of the

---

[6] Statistical and demographic evidence holds more sway and is more commonly cited in class action disparate treatment suits and "pattern and practice" disparate impact cases, where the employment practice at issue is alleged to affect a number of individuals.  Abrams v. Lightolier Inc., 50 F.3d 1204, 1217 (3d Cir. 1995).

speculative.  Chandler does not allege that the number of African Americans in the applicant pool for Penn faculty positions or Penn's graduate schools is proportional to the number of African Americans nationally.  Nor does Chandler claim that Penn rejects applicants for faculty or graduate student spots at a higher rate than candidates of other racial backgrounds or that Penn engages in racially selective candidate solicitation.  All she alleges is that the percentage of black individuals on the Penn faculty and in Penn's graduate schools is not commensurate with the percentage of black individuals in the overall U.S. population.  That is not enough to plausibly claim that Penn intentionally discriminated against *her* on the basis of race when it refused to hire her for a job with the Center.

In sum, Chandler has done little more than allege that she was the only African American to apply for a position with the Center and that she was not hired.  She must do more to state a claim of employment discrimination.

III. Conclusion

For the foregoing reasons, Penn's motion to dismiss is granted and Chandler's § 1981 claim is dismissed without prejudice.  Chandler may amend her complaint within thirty (30) days of the date of this Memorandum.  An appropriate order issues separately.